IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WESCO INSURANCE CO., )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>AKRAM ZANAYED, )<br>AKRAM ZANAYED AND )<br>ASSOCIATES, MICHAEL P. )<br>MUFARREH, AND PROTÉGÉ )<br>INVESTMENTS, INC., )<br>)<br>Defendants. ) | Case No. 22 C 698 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Wesco Insurance Company seeks a declaratory judgment that it has no duty to defend or indemnify Akram Zanayed in connection with a state court counterclaim and a demand for arbitration brought against him by his nephew and former business partner, Michael P. Mufarreh. The parties have filed cross motions for summary judgment. For the reasons stated below, the Court grants Wesco's motion and denies Zanayed's motion.

### Background

The following facts are undisputed. Wesco is an insurance company organized under the laws of Delaware with authorization to issue insurance policies in Illinois. Protégé Investments, Inc. (Protégé) and Akram Zanayed and Associates (AZA) are both

corporations based in Bridgeview, Illinois.[1]  Protégé is a residential real estate management company of which Michael Mufarreh[2] was—at all times relevant to the complaint—the President and CEO, and Akram Zanayed was a shareholder, director, and officer.  Zanayed is also Mufarreh's uncle and a licensed attorney.  Under the Third Amended Shareholder Agreement (the shareholder agreement) executed on July 1, 2018, management decisions of Protégé were to be made jointly by Zanayed, Mufarreh, and Khalili Barbari, another Protégé officer and shareholder.

On September 15, 2020, Zanayed filed a lawsuit against Mufarreh in the Circuit Court of Cook County on behalf of himself and derivatively on behalf of Protégé alleging fraud, conversion, unjust enrichment, and breach of fiduciary duty.  The thrust of Zanayed's complaint was that Mufarreh was converting large sums of money from company accounts and conspiring to oust Zanayed from his position of authority.  Specifically, Zanayed alleged that Mufarreh pressured other shareholders to sell their shares to him so that he could remove Zanayed as an officer and appoint himself as Interim Director of Protégé.

On October 19, 2020, Mufarreh filed a counterclaim against Zanayed in which he referred to the parties' dispute as a "battle for control of Protégé."  Mufarreh's First Am. Countercl. ¶ 1.  The thrust of Mufarreh's counterclaim was that Zanayed converted money from Protégé in the form of sham consulting fees paid to Inshalla Consulting,

---

[1] Wesco seeks no relief from AZA and Protégé other than to bind them to the outcome of this insurance dispute.  On June 8, 2022, the Court entered a default judgment against Protégé for failing to appear in the case.

[2] Because Mufarreh stipulated to be bound by the outcome of this coverage action, Wesco voluntarily dismissed him without prejudice on April 14, 2022.

LLC—another company controlled by Zanayed—and inflated real estate commissions, legal fees, and accounting fees paid to Zanayed himself. Mufarreh also alleges that Zanayed deliberately undervalued Protégé in a 2018 capital raise so that Zanayed could make a profit selling new shares at an inflated price.

On November 26, 2021, Mufarreh filed a demand for arbitration with the American Arbitration Association alleging the following claims against Zanayed: legal malpractice regarding the shareholder agreement and a 2018 capital raise (claims 1 and 2, respectively), breach of fiduciary duties, breach of contract and/or promissory estoppel, violations of Mufarreh's right to inspect Protégé's books and records, conversion, defamation, fraud, and unjust enrichment.

The following allegations in the demand are most relevant to this insurance dispute, which involves Zanayed's entitlement to coverage for Mufarreh's legal malpractice claims. In claim 1, Mufarreh alleged that Zanayed:

> breached his fiduciary duties to Mufarreh by acquiring an ownership interest in Protégé adverse to Mufarreh's interest; failing to disclose conflicts; failing to prepare the shareholder agreement in a manner that was fair and reasonable to Mufarreh; failing to obtain Mufarreh's informed consent in writing to the essential terms of the agreement; misrepresenting to Mufarreh that he had organized Protégé to vest ultimate control in the majority of the shareholders; and failing to disclose that he prepared the agreement to give control to the majority of the officers rather than the majority of the shareholders.

Pl.'s Combined Resp. to Defs.' Cross-mot. for Summ. J. and Reply in Supp. of its Mot. for Summ. J. at 3-4 (summarizing the first of two malpractice claims in Mufarreh's demand).

Mufarreh also alleged that, at the time of Protégé's incorporation, Zanayed did not contribute any money or property to Protégé but nevertheless acquired a one-third

3

ownership interest in the company "because he agreed to perform legal, accounting and bookkeeping work for the company." Mufarreh further alleged that "from Protégé's inception, Zanayed has been solely responsible for creating, maintaining and updating its financial, accounting, business and legal records." Mufarreh's Demand for Arbitration ¶¶ 34-35. Mufarreh alleged that Zanayed prepared all legal documents and performed all legal, accounting and bookkeeping services for each of the Zanayed-Mufarreh Businesses, including [Protégé] . . . ." *Id*. ¶ 37. He further alleged that:

> throughout all of their business dealings together, Mufarreh relied exclusively on Zanayed for legal representation in connection with the formation and operation of Protégé and each and every other one of the Zanayed-Mufarreh Businesses. Zanayed knew this and, though [sic] his words and actions, admitted and continually reinforced Mufarreh's understanding that Zanayed was his attorney and was representing his legal interests.

*Id*. ¶ 39. Mufarreh alleged that "[P]rior to this litigation, there were only two matters related to the operations of the Zanayed-Mufarreh Businesses for which Mufarreh and Zanayed decided to retain legal counsel other than Zanayed." *Id.* ¶ 40. Moreover, Mufarreh alleged, "Zanayed kn[ew] Mufarreh has never retained separate counsel to advise him with respect to legal documents that Zanayed drafted," *id.* ¶ 41, and "assured Mufarreh he was taking care of all legal matters for him." *Id.* ¶ 42. Mufarreh also alleged that "[i]n all the years the parties have worked together, and despite providing Mufarreh with legal representation in countless matters, Zanayed has never presented Mufarreh with a written retainer agreement." *Id*. ¶ 43. Mufarreh alleged that once Zanayed was "comfortable that Mufarreh was placing complete trust in him, he exploited the situation to his advantage by failing to disclose conflicts and, unbeknownst to Mufarreh, structuring businesses and transactions to protect himself and promote his

4

own interests . . ." *Id*. ¶ 44.

On the final page of the shareholder agreement is a disclaimer that states: "ALL PARTIES UNDERSTAND THAT AKRAM ZANAYED DOES NOT REPRESENT THEM IN THIS TRANSACATION [sic] AND THAT THEY HAVE SOUGHT INDEPENDENT COUNSEL OF THEIR CHOSING BEFORE EXECUTING THIS DOCUMENT." Zanayed's Compl., Ex. 1, Third Amended Shareholder Agreement ¶ 12. Mufarreh alleged in his claims against Zanayed that "Zanayed knew this [disclaimer] was false and contrary to his express representations to Mufarreh. Specifically, Zanayed knew that Mufarreh had not 'sought independent counsel' and that Mufarreh understood Zanayed was his lawyer." Mufarreh's Demand for Arbitration ¶ 316. Finally, Mufarreh alleged that, "[b]ased on Zanayed's words and actions, Mufarreh understood that Zanayed was representing him personally as his attorney in connection with the preparation of the Shareholder Agreement . . . ." *Id*. ¶ 317.

On or about June 3, 2022, the parties to the arbitration entered into a confidential settlement agreement and mutual release. Wesco's 56.1(a)(2) Stmt. of Material Facts, Ex. B. Paragraph two of the settlement agreement identifies the amount and nature of the payments being made to resolve the underlying lawsuit and demand for arbitration, none of which are attributed to the legal malpractice claims against Zanayed.

Wesco issued a lawyers liability insurance policy to AZA—number WPP 1024922-07—for the period from February 15, 2020 through February 15, 2021. Zanayed is an insured by virtue of being an employee and officer of AZA. The terms of the policy provide that Wesco:

will pay on behalf of the **Insured** sums in excess of the deductible

>that the **Insured** shall become legally obligated to pay as **damages** *because of a claim* that is first made against the **Insured** and reported to the **Company** during the **policy period** or any Extended Reporting Period *arising out of an act or omission in the performance of legal services by the Insured or by any person for whom the Insured is legally liable* . . . .

Pls.' Compl., Ex. A, § I (A) (italics added). The policy contains the following exclusions:

>This policy does not apply:
>
>. . .
>
>D. to any **claim** based on or arising out of an **Insured's** capacity as:
>
>>1. a former, existing or prospective officer, director, shareholder, partner or manager of a business enterprise or charitable organization unless such enterprise or organization is named in the Declarations;
>
>. . .
>
>F. to any **claim** based on or arising out of **legal services** performed for any existing or prospective partnership, organization, corporation, company or other business enterprise, including any **claim** made by or on behalf of such partnership, organization, corporation, company or other business enterprise, if at the time of the act or omission giving rise to such **claim**:
>
>>1. any **Insured** controlled, operated or managed or intended to control, operate or manage such enterprise; or
>>
>>2. any **Insured**:
>>
>>>a. was a partner or employee of such enterprise; or
>>>
>>>b. directly or indirectly owned more than 10% of such enterprise;

*Id*. §§ IV(D)(1) and IV(F)(1) and (2).

In the present case, Wesco seeks a declaratory judgment that it has no duty to defend or indemnify Zanayed in connection with Mufarreh's counterclaim and arbitration demand. Wesco has moved for summary judgment, contending that, as a matter of

law, the business enterprise exclusions (exclusions D and F) in the policy preclude coverage for Mufarreh's legal malpractice-related claims.  Zanayed has filed a cross motion for summary judgment, contending that the business enterprise exclusions do not bar coverage for the malpractice Mufarreh alleges because Mufarreh says he understood that Zanayed was representing him personally as his attorney when executing the shareholder agreement and in connection with the 2018 capital raise.

## Discussion

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Martinsville Corral, Inc. v. Soc'y Ins.*, 910 F.3d 996, 998 (7th Cir. 2018).  The Court views the evidence and draws all reasonable inferences in the nonmoving party's favor. *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019).  If the nonmoving party fails to establish the existence of an element essential to its case on which it would bear the burden of proof at trial, summary judgment must be granted to the moving party.  *Id.*

The primary issues on the parties' cross motions for summary judgment involve the interpretation of the terms of an insurance policy and their application to underlying legal complaints.  Construction of an insurance policy is typically a question of law appropriately decided on summary judgment.  *Twenhafel v. State Auto Prop. & Cas. Ins. Co.*, 581 F.3d 625, 628 (7th Cir. 2009).  An insurance policy is a contract, and the rules governing interpretation of contracts govern the interpretation of insurance policies.  *Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 933 (7th Cir. 2011).  If the terms of an insurance policy are clear and unambiguous, a court gives those terms their plain meaning and applies the policy as it is written.  *Berrey v. Travelers Indem. Co. of*

*Am.*, 770 F.3d 591, 595 (7th Cir. 2014); *Medina*, 645 F.3d at 933.

A. **Duty to defend**

Under Illinois law, which the parties agree governs, to determine whether an insurer has a duty to defend, a court examines "the underlying complaint and the language of the insurance policy." *Nat'l Cas. Co. v. McFatridge*, 604 F.3d 335, 338 (7th Cir. 2010); *see also U.S. Fid. & Guar. Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 73, 578 N.E.2d 926, 930 (1991). The insurer's duty to defend arises "if the allegations in an 'underlying complaint allege facts within or potentially within the coverage [of the policy].'" *Amerisure Mut. Ins. Co.*, 622 F.3d at 810 (quoting *Santa's Best Craft, LLC v. St. Paul Fire and Marine Ins. Co.*, 611 F.3d 339, 346 (7th Cir. 2010)).

The parties seemingly do not dispute that Mufarreh's counterclaim and demand include factual allegations of legal malpractice that would bring the claims within the scope of the policy, which covers "claim[s] . . . made against the Insured . . . *arising out of an act or omission in the performance of legal services by the Insured* or by any person for whom the Insured is legally liable . . . ." Pls.' Compl., Ex. A, § I (A) (emphasis added). The Court therefore concludes that the allegations in the Mufarreh counterclaim and demand bring the claim within the scope of coverage provided by the Wesco policy.

B. **Business enterprise exclusions**

Wesco contends, however, that coverage is excluded by at least one, if not two, exclusions in the policy. The burden of proving that a claim falls within an exclusion lies with the insurer, and the application of the exclusion must be "clear and free from doubt." *Panfil v. Nautilus Ins. Co.*, 799 F.3d 716, 721 (7th Cir. 2015) (cleaned up).

Wesco contends that the business enterprise exclusions in the policy bar coverage for claims such as Mufarreh's that involve business enterprises (like Protégé) other than the named insured. which in this case is AZA and its lawyers. Specifically, Wesco contends that exclusions D and F relieve it of its duty to defend or indemnify Zanayed because Mufarreh's claims are "based on or aris[e] out of [Zanayed's] capacity . . . as a former, existing or prospective officer, director, shareholder, partner or manager of [Protégé]," Pls.' Compl., Ex. A, § IV(D)(1), and/or are "based on or aris[e] out of legal services performed for any existing or prospective partnership, organization, corporation, company or other business enterprise" that Zanayed controlled, operated or managed, or of which he was a partner or employee or directly or indirectly owned more than 10 percent. *Id*. IV(F)(1) and (2).[3] Zanayed contends that the allegations in Mufarreh's demand summarized above—particularly those in paragraphs 316 and 317—establish that he is suing Zanayed for legal malpractice committed in his personal capacity in connection with his legal representation of Mufarreh in Mufarreh's personal capacity. In other words, Zanayed contends that Mufarreh's claims do not arise out of or are not based on legal services he is claimed to have performed in his capacity as a shareholder, director, and officer of Protégé and do not involve legal services for an entity of which he was an officer or director.

The Court disagrees. Illinois courts have broadly interpreted the phrase "arising out of" in the insurance context to mean "originating from," "having its origin in," "growing out of," and "flowing from." *Maryland Cas. Co. v. Chicago & N.W. Transp. Co*.,

---

[3] Zanayed apparently does not dispute that he meets the requirement of exclusion F that he owned more than 10 percent of the enterprise to which the claims relate.

126 Ill. App. 3d 150, 154, 466 N.E.2d 1091, 1094 (1984); *Allstate Ins. Co. v. Smiley*, 276 Ill. App. 3d 971, 978, 659 N.E.2d 1345, 1351 (1995) ([t]o spring up, originate, to come into being or notice").

Other courts in this district have held business enterprise exclusions to preclude coverage in situations analogous to this case. *See Wesco Ins. Co. v. Wood*, No. 15 C 7190, 2017 WL 4283952, at *13 (N.D. Ill. Sept. 27, 2017) (business enterprise exclusions barred coverage where the majority of the conduct giving rise to the claim was alleged to have occurred while the insured employee was an officer and employee of the outside entity); *see also*, *Darwin Nat. Assur. Co. v. Hellyer*, No. 10 C 50224, 2011 WL 2259801, at *5 (N.D. Ill. June 7, 2011) (business enterprise exclusions barred coverage where allegations were either indirectly resulting from, or a consequence of, the insured's business interest in the company of which it was an officer, director, or shareholder).

In *Wood*, the court held that an insured attorney subpoenaed in connection with a bankruptcy petition was not entitled to lawyer's liability coverage due to a business enterprise exclusion similar to the one in this case. *Wood*, 2017 WL 4283952, at *13. The court concluded that the exclusion applied because the trustee's claims were "based upon or ar[ose]," at least in part, out of the attorney's status as an officer of the company filing for bankruptcy and the legal services she performed for the company. *Id*. (quoting the underlying insurance policy). In *Darwin*, the court similarly held that a claim for legal malpractice fell within an insurance policy's business enterprise exclusion because the claim was based on, arose out of, and was the direct result of the insured attorney's business interest in a company he formed to purchase property from his

10

clients. *Darwin*, 2011 WL 2259801, at *5. The court declined to read certain allegations in the underlying complaint in isolation, instead concluding that "when the underlying claim is read as a whole, it is clear that the thrust of the allegations of negligence stem from the conflict of interest that [the insured attorney] was laboring under as a result of his interest in [his outside company]." *Id.* The court also explained that:

> business enterprise exclusions are frequently included in policies because [i]nsurers calculate liability insurance rates on the assumption that insured attorneys act solely in a legal capacity, and that their professional judgment is unaffected by personal interests. Business enterprise exclusions diminish risk associated with an insured's decision to pursue business opportunities that may result in conflicts between the lawyers' best interests and those of his client.

*Id*.

Mufarreh's allegations against Zanayed clearly "originat[e] from," "hav[e] [their] origin[s] in," "grow[] out of," and "flow[] from" Zanayed's acts and omissions as shareholder, officer, and director of Protégé and/or the legal services he provided to Protégé. *Maryland Cas. Co.*, 126 Ill. App. 3d at 154, 466 N.E.2d at 1094. Mufarreh's counterclaim contains 173 paragraphs, and his arbitration demand contains 487. Zanayed focuses too narrowly on the handful of paragraphs in Mufarreh's demand that state he believed Zanayed was representing him personally in various transactions, ignoring the hundreds of other paragraphs that allege "a years-long pattern of wrongdoing and fraudulent conduct by Zanayed . . . with respect to Protégé . . . and [his] ongoing efforts to cover up [his] fraud and punish Mufarreh for blowing the whistle on [him]." Mufarreh's Demand for Arbitration ¶ 1.

The allegations make clear that Mufarreh was alleging that *while* Zanayed was shareholder, director, and officer of Protégé, he handled all legal matters for the

11

company—in addition to the parties' other joint business ventures—and that the malpractice he is claimed to have committed is the obvious consequence of that role, as he was also "in de facto control of the various businesses' funds, finances, accounting and record keeping." *Id*. ¶ 2. This is underscored by the fact that, in addition to the malpractice claim, the counterclaim and demand included claims for rescission, breach of contract, conversion, defamation, fraud, unjust enrichment, and violations of the Illinois Business Corporation Act all based on Zanayed's alleged attempts to give himself complete control over Protégé and misappropriate its funds.

  Mufarreh also alleged that "[i]n all the years the parties have worked together, and despite providing Mufarreh with legal representation in countless matters, Zanayed has never presented Mufarreh with a written retainer agreement." *Id*. ¶ 43. Not only was there no written retainer agreement, but all signatories to the shareholder agreement at issue, including Mufarreh, attested to the fact that "[THEY] UNDERSTAND THAT AKRAM ZANAYED DOES NOT REPRESENT THEM IN THIS TRANSACATION [sic] AND THAT THEY HAVE SOUGHT INDEPENDENT COUNSEL OF THEIR CHOSING BEFORE EXECUTING THIS DOCUMENT." Zanayed's Compl., Ex. 1, Third Amended Shareholder Agreement ¶ 12. The only reasonable inference that can be drawn from these facts is that that no such retainer agreement was needed because it was implicitly understood that all of Zanayed's legal services were provided in his capacity as a shareholder, director, and officer of Protégé.

  Thus, reading the underlying counterclaim and demand as a whole, "it is clear that the thrust of the allegations of negligence stem from the conflict of interest that [Zanayed] was laboring under." *Darwin*, No. 10 C 50224, 2011 WL 2259801, at *5. To

conclude otherwise would lead to the exact problem the court in *Darwin* cautioned of, which would be to reward Zanayed—with coverage—for his decision to provide legal representation that posed conflicts between the company in which he held a significant financial stake, Protégé, and his supposed individual client, Mufarreh. Despite Zanayed's familial relationship with Mufarreh, his conduct as de facto in-house counsel for Protégé and its top leadership simply cannot be disentangled (for present purposes) from his role as a shareholder, director, and officer of Protégé.

Because the underlying complaint alleges conduct based on or arising out of Zanayed's role as a director, shareholder, and officer of Protégé and/or his rendering of legal services in that capacity—rather than in his personal capacity—the Court finds that the business enterprise exclusions apply to preclude coverage.

## C. Duty to indemnify

The duty to indemnify arises only if there is a duty to defend; a party that has no duty to defend "necessarily" lacks a duty to indemnify. *AU Elecs., Inc. v. Harleysville Grp., Inc.*, 82 F. Supp. 3d 805, 815 (N.D. Ill. 2015); *see also*, *Crum & Forster v. Resolution Trust Corp*, 156 Ill. 2d 384, 620 N.E.2d 1073, 1081(1993) ("Clearly, where there is no duty to defend, there will be no duty to indemnify . . . ."); *see also*, *Health Care Indus. Liab. Ins. Program v. Momence Meadows Nursing Ctr., Inc.*, 566 F.3d 689, 693 (7th Cir. 2009) ("Holding that an insurer has no duty to indemnify therefore follows inexorably from holding that an insurer has no duty to defend."). Because the Court concludes that Wesco has no duty to defend Zanayed against Mufarreh's malpractice-related claims because of the policy's business enterprise exclusions, Wesco is also entitled to summary judgment on the issue of indemnification.

## Conclusion

For the reasons stated above, the Court grants plaintiff's motion for summary judgment [34] and denies defendants' Zanayed and AZA's cross motion for summary judgment [39] and concludes that Wesco has no duty to defend or indemnify defendants Zanayed or AZA in connection with the counterclaim and demand brought against Zanayed by defendant Mufarreh. The Clerk is directed to enter judgment in favor of plaintiff Wesco Insurance Company and against defendants Akram Zanayed and Akram Zanayed and Associates on all claims and declaring that Wesco has no duty to defend or indemnify Zanayed or AZA under the lawyers liability insurance policy it issued to AZA.

Date: February 9, 2023

_____
MATTHEW F. KENNELLY
United States District Judge